**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>NICHOLAS GREGORY EVICH | DOCKET NO.<br>**08  0955M**<br><br>MAGISTRATE'S CASE NO.<br>08- |
|---|---|

Complaint for violation of Title 18, United States Code, Section 2422(b)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ALICIA G. ROSENBERG | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE | PLACE OF OFFENSE<br>Los Angeles | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on or about January 17, 2008, and continuing until on or about April 16, 2008, in Los Angeles County, within the Central District of California, and elsewhere, defendant NICHOLAS GREGORY EVICH knowingly used a facility of interstate commerce, namely, the Internet, to knowingly attempt to persuade, induce, and entice an individual who had not attained the age of 18 years to engage in a sexual activity for which a person could be charged with a criminal offense, namely, Lewd or Lascivious Acts upon a Child Under the Age of Fourteen, in violation of California Penal Code Section 288(a).

FILED
CLERK, U.S. DISTRICT COURT
APR 17 2008
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

LODGED
2008 APR 17 PM 2:07
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF LOS ANGELES
BY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>OLIVER FARACHE |
|---|---|
| | OFFICIAL TITLE SPECIAL AGENT - Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>*Alicia G. Rosenberg* | DATE<br>April 17, 2008 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

JLB:eg          REC: (Detention)



## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises to be searched (the "EVICH RESIDENCE") is the property located at 1539 W. 15th Street, San Pedro, California, 90732.  The EVICH RESIDENCE contains a two-story, single-family residence located on the south side of W. 15th Street with the front door of the residence facing north.  The exterior of the residence is beige stucco with red brick trim.  The residence has a red tile roof.  The numbers "1539" are marked on the front exterior of the residence to the right side of the front door as well as painted on the front curb of the residence.  There is a small staircase with wrought iron railing leading from the sidewalk to the front yard of the residence.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The following items to be seized, which constitute fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Section 2422(b) (Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense), will be found at the EVICH RESIDENCE:

1.    Files and records, including but not limited to e-mails and chat logs, referencing sexual activity by Megan, or any other minor;

2.    Files and records evidencing conversations between EVICH and Megan, or any other minor;

3.    Files and records which evidence the owner of the EVICH RESIDENCE, including but not limited to the user of any computer found in the EVICH RESIDENCE;

4.    Files and records which evidence the user of the screen names "nickge33" or "Nick27197";;

5.    As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.

6.    In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

i

a.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

b.  If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

c.   If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d.   In searching the computer devices, the computer personnel may examine all of the data contained in the computer devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In

ii

addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

      e.   If the computer personnel seize the computer devices pursuant to subparagraph iii above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant.  If, after conducting such a search, the case agents determine that a computer device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device; otherwise, the government will return the computer device.  If the government needs additional time to determine whether the data on the computer devices falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

      7.   In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

      a.   Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

      b.   Any computer equipment used to facilitate the

transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

      c.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

      d.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

      e.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

      f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

      g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## AFFIDAVIT

I, Oliver Farache, being duly sworn, do hereby depose and state:

### I.   INTRODUCTION

1.   I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and I have been so employed for approximately 18 months.   Prior to my employment with the FBI, I was an attorney for approximately 7 years in the private sector. During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity to include an investigation involving the sexual exploitation of children.   During this investigation I assisted Special Agent (SA) Marc Botello of the FBI.   During the investigation of these cases, he has executed and participated in the execution of search and arrest warrants and seized evidence of violations of United States law.   SA Botello currently investigates, among other things, the sexual exploitation of children and child pornography in the Central District of California as part of the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team.   The SAFE Team is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under Title 18, United States Code, Section 2251, et seq.

## II.  PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a criminal complaint and arrest warrant charging NICHOLAS GREGORY EVICH with violating Title 18, United States Code, Section 2422(b); Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense.[1]  This affidavit is also submitted in support of an application for a warrant to search 1539 W. 15th Street, San Pedro, California, 90732, (the "EVICH RESIDENCE," described in detail below), for evidence of violations of Title 18, United States Code, Sections 2422(b).

3.    This affidavit is intended to show that there is sufficient probable cause for the requested criminal complaint and search warrant and does not purport to set forth all my knowledge of, or investigation into, this matter.

## III.  <u>PREMISES TO BE SEARCHED</u>

4.    The premises to be searched (the "EVICH RESIDENCE") is the property located at 1539 W. 15th Street, San Pedro, California, 90732.  The EVICH RESIDENCE contains a two-story, single-family residence located on the south side of W. 15th Street with the front door of the residence facing north.  The

---

[1] The conduct at issue would support numerous charges including but not limited to, Lewd Act upon a Child Under the Age of 14, California Penal Code, Section 288a.

2

exterior of the residence is beige stucco with red brick trim. The residence has a red tile roof.  The numbers "1539" are marked on the front exterior of the residence to the right side of the front door as well as painted on the front curb of the residence. There is a small staircase with wrought iron railing leading from the sidewalk to the front yard of the residence.

### IV.   SHORT SUMMARY

5.   As set forth in detail below, in January 2008, 28-year-old NICHOLAS EVICH contacted Megan, whom he believed to be a 13-year-old girl, in an AOL chatroom.[2]  In his first conversation with Megan, EVICH asked Megan if she was a cop because he could get in trouble, because of her age, but continued chatting with her and in subsequent conversations, suggested meeting in person. From January 2008 through April 2008, EVICH regularly spoke to Megan, via the Internet, about sex and the possibility of meeting in person to engage in sex.  Finally, in April 2008, he arranged to meet Megan for sex on April 18, 2008.

### V.   DEFINITIONS AND BACKGROUND INFORMATION

6.   In this affidavit, the term "minor" and "sexually explicit conduct," as used herein, are defined as set forth in 18 U.S.C. § 2256.

7.   Based on my discussions with SA Botello, other SAs who have many years of experience investigating child pornography and

---

[2]In truth, "Megan" was an undercover FBI agent.

3

child exploitation cases, and my own personal knowledge, I have knowledge of the Internet and how it operates. For example, I know that the Internet is a worldwide computer network that allows communications, information and data to be transmitted from one computer to another across state, national and international boundaries. Among the ways that individuals who utilize the Internet can communicate with one another is through the use of electronic mail messages ("e-mail") and Instant Messenger messages ("IM").

8. The term "computer, " as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device but does not include an automated typewriter or typesetter, a portable hand held calculator, or some other similar device."

9. **E-MAIL.** E-mail is an electronic form of communication from one person to one or more persons via the Internet which usually contains typed-written correspondence and may contain audio and visual images. The physical world equivalent to e-mail is writing a letter on paper to somebody and sending it to them via the U.S. Postal Service. An e-mail usually contains a

4

message "header" which generally displays the sender's e-mail address, the recipient's e-mail address, and the date and time of the e-mail transmission.   If a sender chooses to do so, he or she can type a subject line into the header.

10.  **Chat Rooms.**   A chat room is a public area of the Internet that users can visit in order to type messages to one another.   When an Internet user joins a chat room, he or she can view the text that is typed by any of the other participants to the chat.   The physical world equivalent to a chat room would be for a person to stand in a room full of people and shout a message so loudly that everyone in the room can hear it.   Chat rooms usually are named based on a topic of interest and users can choose rooms to enter by searching for chat room names that reflect their particular areas of interest.

11.  **Instant Messages.**   IMs allow an Internet user to send and receive messages in real time to one specific user (instead of a group of users).   IMs are similar to e-mail except that IMs are sent virtually instantaneously, and both parties to the message are normally logged into the Internet for the purpose of engaging in a real-time communication.   In order to communicate via IMs, users must be logged onto the Internet using a unique "screen name," which must be different from those already in use during the ongoing chat session.

12.  IM conversations also can be called "chat sessions"

5

even though it is a conversation between only two people.
Individual users can also transmit photographs or graphic files
in real time during an IM chat session.

13. A user can (although it is not required) be in a chat
room and also at the same time send an IM to any other on-line
user, including one that is in the same chat room.  The physical
world equivalent of this would be if a person is in a room full
of people and then leans over to whisper a message in the ear of
another individual in the room.  If the message is sent via IM,
only the sender and receiver can view the message.

14. I know from my discussions with SA Botello, and from
conversations with other agents with extensive experience in
investigating child exploitation crimes, that it is a common
practice for those who attempt to entice a minor to engage in
sexual activity via the Internet to utilize e-mail, IMs, and chat
room services in committing this crime.

15. Based on my discussions with SA Botello, I know that
people commonly use abbreviations during IM chatting.  Some
examples of these would be:  "oic" for the phrase "Oh, I see";
"brb" for "Be right back"; "k" for "Okay"; and "lol" for
"Laughing out loud."  I also know that it is common for people in
IM chats to type in incomplete sentences, to misspell words
frequently, and to not use capital letters.  Throughout the IM
chat sessions described below, SA Botello used some of these

abbreviations.

16. **AOL Incorporated.**  Based on discussions with SAs who have many years of experience investigating child pornography and child exploitation cases, and my own personal knowledge, I know the following about America Online ("AOL"):

a.   AOL is a company or Internet Service Provider ("ISP") that sells access directly to the Internet.  AOL allows its subscribers to connect to the Internet.

b.   Each subscriber to AOL has access to a computer which communicates with the central computer system operated by AOL in the State of Virginia.

c.   AOL maintains records pertaining to its subscribers.  These records include subscriber information, account access information, e-mail transaction information, account application information, and other information which records the activities and interactions of these accounts.

d.   AOL offers its subscribers the ability to communicate with other individuals via e-mail, chat rooms, and IMs.  For identification purposes, each AOL user must create a unique screen name or profile, which can be viewed by all other members.

e.   AOL has a feature entitled "Buddy List, " which permits AOL members to place other AOL members on a contact list. When an AOL member signs onto the Internet, their "Buddy List"

will inform them which of the other members of the "Buddy List" are currently on-line.

## VI. PROBABLE CAUSE

17.   I have spoken to SA Botello about this case.  From my conversations with him, I learned the information in section VI of this affidavit.

### A.   On January 17, 2008, EVICH Contacts 13-year-old Megan

18.   On January 17, 2008, SA Botello logged onto AOL in an undercover capacity using the AOL profile "MsMegan818."  This profile, which other AOL users are able to access and review, identified "MsMegan818" (hereinafter referred to as "Megan") as an 8th grade girl named Megan who lived in Southern California, and who was interested in the beach and her friends.

19.   SA Botello joined a chat room created by AOL users entitled "ilovemucholdermen" using Megan's screen name.  At approximately 5:46PM, an individual using the AOL screen name "nickge33," later identified as NICHOLAS EVICH, initiated a private IM chat session with Megan.  During this first conversation, EVICH confirmed that because Megan was only 13 years old, he could get in trouble, but could continue to chat with her as long as she did not tell anyone.  More specifically, the January 17, 2008 chat included the following:

a.   EVICH wrote "from so cali" and "28," describing himself as a 28-year-old male from southern California.  He then said "ur age," asking Megan how old she was.  After Megan

8

responded "im 13," EVICH stated "oh very sorry…u like older" questioning Megan if she liked older guys.

b.   Megan told EVICH that she had to leave the chat conversation to do her homework and asked if EVICH would be online later.  EVICH responded, "yea just im me

20.   After this initial contact, EVICH had numerous conversations with Megan.   Some of these conversations are summarized below.

**B.   EVICH'S January 18, 2008 Conversation With Megan**

21.   On January 18, 2008, at approximately 4:05PM, EVICH sent Megan an instant message, initiating an on-line conversation with Megan.   This conversation included the following:

a.   EVICH asked Megan, "would u go out wit me if i asked you out?"  Megan then asked EVICH if he was serious.   EVICH stated he was serious, stating "ok but can you keep it a secret, I am serious but just worried."  After Megan asked EVICH why he was worried, EVICH stated, "getting caught, going to jail, I'm 28 sweetie and ur just 13."

b.   EVICH told Megan that he thought they should meet, stating "I think we should try meeting, what do you think Megan?"  Megan indicated she was willing to meet and asked EVICH what he wanted to do.   EVICH stated, "make out with you" and "maybe if we go out a few times i could show you my dick, if u'd like to see it."

**C.   EVICH'S January 29, 2008 Conversation With Megan**

9

22.  On January 29, 2008, at approximately 5:23PM, EVICH sent Megan an Instant Message, initiating an online conversation with Megan.  This conversation included the following:

a.  EVICH told Megan he preferred younger girls rather than girls his own age, stating "i really like young girls like you more then girls my age."

b.  EVICH and Megan discussed meeting the following weekend and EVICH asked, "u'd meet me this weekend huh?"  As the conversation continued, EVICH and Megan discussed what they would do when they met.  EVICH asked Megan if she wanted to see his penis, stating "if i pull down my pants would u like to see whats in front too?" Megan asked EVICH if he meant just his pants. EVICH stated "no my cock sweetie."

c.  EVICH asked Megan if she wanted to perform oral sex on him when they met stating, "would u want to give me head this weekend if we connect?"

D.  **EVICH'S March 11, 2008 Conversation With Megan**

23.  On March 11, 2008, at approximately 5:14PM, EVICH, using the screen name "Nick27197," sent Megan an Instant Message, initiating an online conversation with her.  During this conversation, EVICH told Megan that his screen name used to be "nickge33," stating "my screen name was nickge33."

a.  EVICH asked Megan if she still wanted to meet him, stating "did u still wanna meet in person?"  After Megan indicated she was willing to meet him, EVICH stated, "we could meet up at the mall or something."

10

b.     EVICH told Megan they could meet at a mall and asked her what mall was close to her home.  Megan informed EVICH that the Westside Pavillion on Pico Boulevard was close to her home.

c.     EVICH asked Megan if she would be willing to "make out" with him if they went to the movie theater at the mall. EVICH further asked Megan, "would you be mad if i put ur hand on my crotch in the movie theatre?"  MEGAN asked EVICH if he meant on the outside of his pants.  EVICH responded, "unless you wanna reach inside it?"

d.     EVICH informed Megan that he would like to do more with her but did not think she was ready yet, stating "would like to do more but don't think u are ready for more yet."  After Megan asked EVICH what he meant, EVICH stated he meant sexual intercourse stating, "no i mean down the road like sex maybe." Megan asked EVICH if he wanted to have sex with her and EVICH stated, "dont go telling people but yea i would."

E.     **EVICH'S March 20, 2008 Conversation With Megan**

24.    On March 20, 2008, at approximately 2:46PM, EVICH sent Megan an Instant Message, initiating an online conversation. During this conversation, EVICH discussed his desire to teach Megan how she could masturbate him.  Specifically, this conversation included the following excerpt:

EVICH:     no i mean u don't wanna jerk it off or suck it do you?

Megan:     i wudnt know how to do that

11

EVICH:     i could teach you Megan

Megan:     teach me?...like what

Megan:     kissing n stuff?

EVICH:     how to jerk my dick

Megan:     like how

EVICH:     take ur hand and guide it stroking my cock, would u like   that?

Megan:     u keep asking me stuff i dont know…(frown)

25.    Other parts of the March 20, 2008 conversation included the following:

a.    EVICH asked if he could get Megan's picture, stating "can i get ur pic again." Megan also suggested EVICH send his picture as well. EVICH e-mailed Megan a picture of himself wearing a black t-shirt with gray sleeves. As stated in paragraph 31b, below, this photograph matches the California Department of Motor Vehicles photograph for EVICH.

b.    Megan sent EVICH an e-mail containing a photograph of "herself." The photograph actually depicted a Special Agent of the FBI, taken when she was approximately 13 years old. The photograph depicts a young female with long brown hair wearing a gymnastics uniform. After receiving the picture, EVICH stated, "yea u got a hot lil ass there."

F.    **EVICH'S March 25, 2008 Conversation With Megan**

26.    On March 25, 2008, at approximately 7:15AM, EVICH sent Megan an instant message, initiating an online conversation where he discussed his desire to perform sex acts on Megan. The

12

conversation included the following:

     a.   EVICH discussed his desire to engage in various sex acts with Megan.  EVICH asked Megan if she knew what would feel good to him at that moment.  After Megan asked "what," EVICH stated, "my index finger in ur pussy, would u like that."

     b.   EVICH continued by telling Megan he wanted to "finger" her vagina, stating "would u let me finger it Megan" and "ok i want to stick my finger inside ur pussy thats what girls like."  EVICH also told Megan that he wanted to stick his tongue in her vagina as well, stating "yea but I would like to stick my tongue in there too Megan, i think u would like that better."

**G.   On April 15, 2008, EVICH Arranged to Meet Megan In Person**

    27.  On April 15, 2008, at approximately 3:42PM, EVICH sent Megan an instant message, initiating an online conversation where he again discussed meeting Megan for sex.  That conversation included the following:

     a.   EVICH asked Megan if she was free on Friday to meet and asked, "you free this friday after school?" and "would you want to meet in a mall by ur house after school this friday?"

     b.   EVICH and Megan discussed having sex with EVICH stating, "yea cus I would seriously shoot myself if I had sex with you before ur 18 Megan, I like you too much to take advantage of you."  After Megan asked EVICH if he thought it was bad to have sex, EVICH quickly changed his position about having sex with Megan, stating "i mean cus of ur age it is yes, but i mean ur cute and I like you, so i mean i would only if you wanted

13

to with me Megan."

      c.   EVICH informed Megan he is willing to meet on Friday and asked Megan for the address to the mall. Megan told EVICH that the Westside Pavillion was located on Pico Boulevard near Westwood Boulevard. Megan asked EVICH what time he wanted to meet stating, "like what time?" EVICH responded, "ok i mean like 3:30pm cool?" Megan advised that should be okay with her.

**H.  On April 16, 2008, EVICH Discussed Bringing a Condom to the Meeting, and Having Oral Sex With Megan**

26.  On April 16, 2008, at approximately 4:12PM, EVICH sent Megan an instant message, initiating an online conversation where EVICH e-mailed Megan a picture of his penis. That conversation included the following:

      a.   During the conversation, EVICH informed Megan that she had a waiting e-mail message from him, stating "u got mail." Opening the e-mail revealed a picture of adult erect penis. Megan asked, "who is that?" EVICH indicated it was a picture of his penis, stating "mine silly…took it this morning."

      b.   EVICH and Megan discussed meeting later in the week at the mall and EVICH said he would bring a condom, stating "i'll bring a condom just in case, but we wont." Megan asked EVICH why he was going to bring a condom if he was sure they were not going to have sex. EVICH stated, "just to be safe."

      c.   EVICH told Megan he might want to perform oral sex on her when they met, stating "i might want to lick ur pussy

Friday." When Megan responded "really?," EVICH stated, "yea u
turn me on" and "ur hot for 13, u like older men."

      d.    EVICH and Megan discussed meeting at the Barnes
and Nobel bookstore at the Westside Pavillion on Friday. Megan
asked EVICH if he knew where it was and EVICH stated, "yea we can
meet there."

      e.    EVICH asked Megan if she wanted to masturbate him
in his truck on Friday when the meet stating, "did you wanna
stroke off my dick in my backseat friday?" After Megan asked if
EVICH thought girls liked doing that to guys, EVICH stated, "well
they like sucking it too."

## J.   Identification of GARY EVICH and the EVICH RESIDENCE

    28.  For each Instant Message conversation between EVICH and
Megan described above, EVICH used the AOL screen name "nickge33"
or "Nick27197." In at least one of the conversations EVICH
implied he was chatting from a computer in his home, such as
telling Megan he was in his bedroom at the time of their
conversation.

    29.  On or about February 1, 2008, SA Botello reviewed a fax
dated February 1, 2008, that had been provided by AOL regarding
the AOL screen name "nickge33." He learned that the AOL
subscriber for the screen name "nickge33" is Eric Schroeder, 1539
W. 15th Street, San Pedro, California, 90732. However, the
credit card listed on the account is in the name of NICHOLAS G.
EVICH.

    30.  On April 16, 2008, SA Botello conducted a check of

15

public records, Law Enforcement Report, for NICHOLAS EVICH and found that a person named NICHOLAS G. EVICH, with social security number xxx-xx-3282, had an address of 1539 W. 15th Street, San Pedro, California, 90732 (the EVICH RESIDENCE).

31.  On April 16, 2008, SA Botello reviewed a California Department of Motor Vehicles ("DMV") report which provided the following information for NICHOLAS GREGORY EVICH, social security number xxx-xx-3282:

a.   NICHOLAS GREGORY EVICH, born in 1979, was issued California drivers license number B6455278.  The address listed for EVICH was 1539 W. 15th Street, San Pedro, California, 90732 (the EVICH RESIDENCE).

b.   SA Botello also reviewed the photograph on file with the California DMV for NICHOLAS GREGORY EVICH.  The person depicted in the DMV photography closely resembled the image sent via e-mail to "Megan" on March 20, 2008.

## VII.   COMPUTER DATA

32.  Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

16

a.   Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A

17

single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.   Storage devices capable of storing 160 gigabytes (GB) of data are now commonplace in desktop computers.   Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would completely fill a 35' x 35' x 10' room to the ceiling.   Further, a 160 GB drive could contain as many as approximately 150 full run movies or 150,000 songs.

       d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.   For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.   Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.   Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

## VIII.   __ITEMS TO BE SEIZED__

33.   Based on the information set forth below, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 18, United States Code, Section 2422(b) (Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense), will be found at the EVICH RESIDENCE:

a.   Files and records, including but not limited to e-mails and chat logs, referencing sexual activity by Megan, or any other minor;

b.   Files and records evidencing conversations between EVICH and Megan, or any other minor;

c.   Files and records which evidence the owner of the EVICH RESIDENCE, including but not limited to the user of any computer found in the EVICH RESIDENCE;

d.   Files and records which evidence the user of the screen names "nickge33" or "Nick27197";

e.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form.

f.   In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel

executing this search warrant will employ the following procedure:

(i)  Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices (collectively the "computer devices") to determine whether the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the computer devices.

(ii) If the computer devices can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, they will be searched on-site, and a computer device will be seized only if the search reveals it to contain any data that falls within the list of items to be seized set forth herein.

(iii) If the computer devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the computer devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

(iv) In searching the computer devices, the computer personnel may examine all of the data contained in the

20

computer devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

      (v)  If the computer personnel seize the computer devices pursuant to subparagraph iii above, the computer personnel will search the computer devices or data images within a reasonable amount of time not to exceed 60 days from the date of execution of the warrant.  If, after conducting such a search, the case agents determine that a computer device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the computer device; otherwise, the government will return the computer device.  If the government needs additional time to determine whether the data on the computer devices falls within any of the items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original sixty day period from the date of execution of the warrant.

      g.  In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

      (i)  Any computer equipment and storage device capable of being used to commit, further or store evidence of the

21

offense listed above;

(ii) Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

(iii) Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, and personal digital assistants;

(iv) Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

(v)  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

(vi) Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

(vii) Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

IX.  CONCLUSION

22

34. Based on the facts set forth herein, and based on my training, education, experience, and participation in this investigation, there is probable cause to believe that NICHOLAS GREGORY EVICH has violated Title 18, United States Code, Section 2422(b): Attempted Use of Facility of Interstate Commerce to Induce a Minor to Engage in Criminal Sexual Activity for Which a Person Could be Charged with a Criminal Offense.  There is also probable cause to believe that evidence of Title 18, United States Code, Section 2422(b) will be found at the EVICH RESIDENCE.

OLIVER N. FARACHE
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me this 17th day of April 2008 .

UNITED STATES MAGISTRATE JUDGE

23